Filed 6/18/25  S.S. v. Superior Court CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

|  |  |
|---|---|
| S.S., Petitioner, v. THE SUPERIOR COURT OF ORANGE COUNTY, Respondent; ORANGE COUNTY SOCIAL SERVICES AGENCY et al., Real Parties in Interest. | G065284 (Super. Ct. No. 18DP0929A) O P I N I O N |

Original proceedings; petition for extraordinary writ relief to challenge an order of the Superior Court of Orange County, Daphne Grace Sykes, Judge. Petition denied.

Martin Schwartz, Orange County Public Defender, Richard Cheung, Assistant Public Defender, Brian Okamoto, Deputy Public Defender for Petitioner S.S.

No appearance for Respondent.

Leon J. Page, County Counsel, Debbie Torrez and Aurelio Torre, Deputy County Counsel for Real Party in Interest Orange County Social Services Agency.

\*          \*          \*

S.S. (Mother) seeks relief from an order of the juvenile court finding she received reasonable reunification services and setting a date for a hearing pursuant to Welfare and Institutions Code section 366.26.[1] We find no error in the order and deny the writ.

## FACTS

### I.

#### INITIATION OF DEPENDENCY PROCEEDINGS

On September 27, 2023, Mother—who had been diagnosed with schizoaffective disorder, bipolar type—arrived in a manic state at the school her then five-year-old daughter, B.S., attended and began yelling at the principal.[2] Mother picked up a soda can from the counter and poured it on the principal, soaking the front of the principal's shirt. When the can was empty, Mother threw it at the principal. Mother then picked up a potted plant from a counter and, after aiming it at the principal, changed direction and threw it

---

[1] All further statutory references are to the Welfare and Institutions Code, unless otherwise indicated.

[2] Mother had verbally berated staff at the school on several prior occasions. On at least one of those occasions, the police were called to assist.

over the front counter, where it shattered on the floor. Mother headed toward the exit and, as she was leaving, turned to the principal and, with a clenched fist over her head, threatened to "fuck" the principal up. The incident was captured on video.

The police were called and interviewed Mother. According to the investigating officer, Mother was incoherent and rambling. She claimed the principal asked her to pour soda on her breasts, denied throwing the soda can at the principal, admitted throwing the potted plant, and denied threatening to hit the principal. Mother disclosed she had been diagnosed with schizophrenia but was not taking her medication.[3]

Based on the statements he obtained and his review of the video footage, the investigating officer determined he had probable cause to arrest Mother for her conduct. He informed Mother she was under arrest, but she resisted, turning her body toward the officer and driving her head into his chest. After some further struggles, Mother was handcuffed, booked, and later released.

Six days later, on October 3, 2023, social workers and law enforcement officers arrived to serve a warrant removing B.S. from Mother's care. Mother was initially resistant. She called 911 and asked for officer assistance, claiming the investigating social worker was stalking her. After further argument, Mother ultimately agreed B.S. could be transported to a children's home. As the officers and social worker were leaving with B.S.,

---

[3] The maternal grandmother confirmed Mother, a diagnosed schizophrenic, had not been taking her medication or receiving psychiatric services for at least two months after her psychiatrist dismissed Mother for unknown reasons.

Mother noted to an officer that B.S. was wearing shorts under her dress and began to pull down B.S.'s pants and underwear, exposing her buttocks.

Orange County Social Services Agency (the Agency) filed a juvenile dependency petition on October 5, 2023, alleging jurisdiction pursuant to section 300, subdivisions (b)(1) and (g).[4] The detention hearing was held the following day. Neither Mother nor the alleged father appeared, and the juvenile court ordered B.S. detained and placed her with a foster caregiver. Mother appeared before the court later that day and was appointed counsel.

## II.

### VISITATION

Under the juvenile court's October 6, 2023 order, Mother was authorized to have eight hours of weekly monitored visitation with B.S. Mother stated she did not want to see B.S. in person and elected to have visitation through video calls. Mother had eight video calls with B.S. between October 13 and October 24, 2024. B.S.'s caregiver reported B.S. was reluctant to participate in the calls and wanted to end each call earlier than scheduled. The caregiver also reported Mother missed at least one call and made inappropriate comments during the calls about B.S. returning home. On October 19, 2023, the caregiver reported it took five minutes to get B.S. to

---

[4] B.S. had previously been declared a dependent. She was removed at birth due to Mother's mental health issues. At the time of B.S.'s birth, Mother was under a conservatorship, which prevented her from having B.S. in her care. Mother received reunification services from August 29, 2018 through September 29, 2020, when B.S. was conditionally returned to her care. In May 2022, dependency was terminated and B.S. was returned to Mother's sole custody. B.S.'s alleged father waived participation in these prior dependency proceedings.

participate in the video call, after which she ran away screaming and scared. Mother responded by screaming at the caregiver not to touch her daughter and asked B.S. if the caregiver was touching her vulva and hurting her. After B.S. left the call, Mother told the caregiver B.S. had been sexually assaulted at her school and claimed B.S.'s prior school had a book with a picture depicting the caregiver touching B.S.'s vulva. Mother subsequently sent the caregiver pictures of the book she had referenced, but none of the pictures depicted what Mother described.

III.

THE OCTOBER 25, 2023 VISIT TO THE DENTIST AND THE FOLLOWING DAYS

On October 25, 2023, Mother and the caregiver accompanied B.S. to a dental appointment. At some point in the visit, Mother tried to force B.S. to sit on her lap.[5] B.S. began crying uncontrollably and trying to get away from Mother. Mother was heard screaming "'she needs to sit with me'" and "'she needs to tell her to sit with me'" while pointing to the caregiver. Staff members attempted to calm Mother and told her she was hurting B.S. When B.S. tried to pull away from Mother, Mother pulled her back aggressively and told her "'[Y]ou're coming home.'" After a staff member convinced Mother to let go of B.S., Mother called the caregiver a "'bitch'" and said she knew all the things the caregiver was doing to her child. Mother also called the caregiver a "'fat racist fucken white trash bitch.'" When a staff member asked Mother to leave, she refused. Ultimately, the police were called.

On October 26, 2023, when asked by the social worker how she was sleeping at night, B.S. said "'scary [M]ommy,'" but would not elaborate.

---

[5] The caregiver videotaped the incident, and the video was reviewed by the Agency.

When the social worker inquired about what happened at the dental office, B.S. said "'Mommy . . . was scary. She was going to take me.'" When asked if she was scared to be with Mother, B.S. nodded and said she did not want to go with Mother and when asked if she wanted another in-person visit, B.S. said "'No I am too scared.'" During a call that evening, B.S. told Mother she was a monster.

After the incident at the dental office, Mother sent the social worker a series of texts stating B.S. was dying and needed to be removed from the caregiver. Mother also sent the social worker numerous nonsensical texts accusing the caregiver of various wrongdoing, including blackmailing Mother, sending Mother moaning videos, keeping B.S. in church from 8:00 a.m. to 2:00 p.m. every day without food, and pinching B.S. Mother also reported to the Agency that B.S. was the victim of child pornography because Mother's in-home supportive services worker had seen B.S. expose herself on camera.

## IV.

### VISITATION IS SUSPENDED

On November 9, 2023, the Agency filed an ex parte application asking the juvenile court to suspend all visitation until Mother's and B.S.'s therapists deemed it appropriate. The application was made based on a concern that contact with Mother was having a detrimental effect on B.S.'s mental well-being. The court granted the application and ordered: "The Court ceases all visitations between the mother and [B.S.] until deemed appropriate by the mother's and child's therapists. Furthermore, the Court restricts the

6

mother's right to attend any medical or dental appointments. Once deemed appropriate by the therapists, visitations take place in a therapeutic setting."

A jurisdiction hearing was initially set for November 15, 2023, but later continued to March 6, 2024. On March 6, 2024, the juvenile court declared B.S. a dependent of the court and ordered her removed from her parents' care. At the hearing, Mother asked the court to lift the suspension of visitation, but the court reiterated its November 2023 order, specifying visitation would only occur when approved by Mother's and B.S.'s therapists.[6]

V.

B.S.'S PROGRESS DURING SUSPENSION OF VISITATION

In the weeks after visitation ceased, the caregiver reported B.S. did not ask about Mother, was sleeping through the night without nightmares, had exhibited a decrease in violent behavior, had stopped drawing or talking about monsters in the woods and, for the first time since her placement with the caregiver, made positive drawings.

On December 22, 2023, when asked by the social worker about Mother, B.S. responded: "'Scary.'" When asked by the social worker if she wanted to see Mother, B.S. declined. In early 2024, B.S. told the caregiver she wished to stay with the caregiver forever and not go back to Mother. B.S. also told the social worker she did not want to see Mother "'all the time. Just some time. I don't want to live there.'"

B.S. began seeing a therapist at her school on November 27, 2023. She continued to see a therapist through the following year. In August

_____

[6] Mother appealed the juvenile court's March 6, 2024 order. The appeal (case No. G063949) was dismissed on May 30, 2024, after Mother's appointed counsel filed a brief stating it could find no arguable issues.

2024, B.S.'s therapist reported B.S. did not independently bring up Mother. When asked by the therapist if she wanted to see Mother, B.S. responded she did not. B.S. also stated Mother was mean to her. According to the therapist, B.S. shut down and changed the subject when the topic of visitation was discussed and stayed quiet during the remainder of any session in which visitation was discussed. Based on her sessions with B.S., B.S.'s therapist did not recommend resuming visitation.

As late as November 2024, B.S. still did not want to see Mother, shut down whenever Mother was discussed, and appeared afraid of Mother. Further, there appeared to be a correlation of increased regressive behaviors by B.S. following sessions in which the therapist raised the topic of visitation.

VI.

MOTHER'S PROGRESS DURING SUSPENSION OF VISITATION

Following the initial hearing before the juvenile court, the Agency submitted a counseling referral for individual therapy for Mother and conjoint therapy for Mother and B.S. The referral was approved on November 20, 2023, and a therapist was referred to provide individual therapy for Mother and conjoint therapy for her and B.S. Shortly thereafter, the referred therapist contacted the Agency and told them she could not work with Mother. The therapist had not physically met with Mother but had several phone interactions with her in which Mother "'rage[d] and rumble[d].'" The therapist said she could not work with Mother until Mother was in a different state of mind.

In June 2024, Mother began participating in individual therapy with a different therapist referred by the Agency. After meeting with Mother several times, the therapist reported she was not yet able to make a

8

recommendation regarding visitation but expressed concerns about Mother's ability to care for herself or B.S.

In September 2024, Mother reported to the social worker that "people were coming into her apartment at night and . . . tying her up." The following day, Mother showed the social worker her wrists, which did not appear to have any signs of having been tied up. A day later, Mother asked the social worker for the protocol "regarding someone coming into her home and tying her up and attacking her." The therapist opined that Mother continued to lack insight into her own behaviors and remained delusional. In October 2024, Mother's therapist reported Mother's progress had been limited.[7]

## VII.

### RESUMPTION OF VISITATION

At a hearing on September 6, 2024, the juvenile court issued the following order regarding visitation: "The Court gives authority/discretion to child's therapist to determine if contact is to be made between minor and mother. [¶] If therapist determines it is appropriate for contact, contact needs to be in a therapeutic setting with the therapist present and will be via facetime."

At a hearing on November 25, 2024, the juvenile court modified the visitation order to allow one monitored in-person visit of up to one hour outside of a therapeutic setting before the next scheduled hearing on January 14, 2024, and gave the Agency discretion to determine if additional monitored visitation would be appropriate. The in-person visitation took place on

---

[7] According to the reports submitted to the juvenile court, Mother was hospitalized at least five times between March and September 2024.

December 23, 2024. It lasted one hour and went fairly well. The caregiver reported B.S. had more outbursts after the visit, however, and it took longer to calm her. B.S. reported having been "'a little nervous but happy'" about seeing Mother but expressed the desire to have a shorter visit the next time.

On January 14, 2025, the juvenile court issued an order allowing one in-person, one-hour monitored visitation per month, to be held at the Agency's office or in a therapeutic environment, plus weekly monitored video calls of approximately 30 minutes in the weeks without the in-person visit. After the order was issued, Mother had several video calls with B.S. without any significant issues.

On February 13, 2025, the juvenile court directed the Agency to evaluate liberalizing Mother's in-person visits. Shortly thereafter, Mother became upset with B.S. during an in-person visit and failed to attend the next scheduled video call.

On March 10, 2025, at a combined six- and twelve-month review hearing, the juvenile court determined returning B.S. to Mother would create a substantial risk of detriment to B.S.'s safety, protection, or physical or emotional well-being. The court also determined reasonable reunification services had been provided to Mother but the extent of progress made toward alleviating or mitigating the causes necessitating placement had been moderate. The court ordered reunification services terminated and set a section 366.26 hearing.

## DISCUSSION

By her writ, Mother challenges the juvenile court's March 10, 2025 order finding she was provided reasonable reunification services. Mother emphasizes she is not appealing the court's November 9, 2023 order suspending visitation or the March 6, 2024, October 9, 2024, and November

10

25, 2024 orders confirming that order.[8] To the contrary, she concedes the orders were proper ("the juvenile court's visitation order was rationally based on Mother's behavior at the traumatizing October 25, 2023 dental visit and supported thereafter by reports of B.S. fearing her mother as well as recommendations by B.S.'s therapist against family time") and that, indeed, she could not have challenged the orders by this writ ("Mother makes no attempt here to appeal the juvenile court's visitation orders, nor could she for the reasons [the Agency] painstakingly points out [in its brief]"). Mother also concedes she is not challenging the reunification services provided by the Agency ("[n]or does Mother fault [the Agency] for complying with the juvenile court's visitation order, or in its provision of 'numerous, comprehensive services' specific to Mother's individual needs'"). Accordingly, we do not address the validity of the court's visitation orders or the services provided by the Agency.

Mother's writ challenges only the juvenile court's finding that she was offered reasonable reunification services. The challenge is based solely on Mother's unsupported theory that B.S.'s therapist could have recommended resumption of visitation at some earlier (but unspecified) date.

A juvenile court's finding that reasonable services were provided "must be made upon clear and convincing evidence." (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 971.) "We review a reasonable services finding to determine if it is supported by substantial evidence. [Citation.] We consider the evidence in the light most favorable to the prevailing party and indulge in

---

[8] Because Mother specifies she is not challenging these orders, we do not address the Agency's argument that Mother forfeited any challenge to them.

all legitimate and reasonable inferences to uphold the court's ruling." (*In re A.G.* (2017) 12 Cal.App.5th 994, 1001.) "'We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court.'" (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 689.) "The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.) "The burden is on the petitioner to show that the evidence is insufficient to support the juvenile court's findings." (*In re A.G., supra,* 12 Cal.App.5th at p. 1001.)

Substantial evidence supports the juvenile court's finding that Mother was offered reasonable reunification services under the circumstances. Mother was granted visitation and that privilege was suspended only when she engaged in threatening and frightening behavior at the dental office. Mother acknowledges the suspension was justified and further acknowledges the court's continuation of the suspension was supported by reports from B.S. and her therapist. Mother's speculation that B.S.'s therapist could have done more to prepare B.S. for resumed visitation or could have recommended resumption of visitation earlier does not meet her burden of establishing insufficient evidence to support the court's finding she was provided *reasonable* reunification services.

Further, although Mother attributes the delay in resumption of visitation to the therapist, the record demonstrates the juvenile court acted independently in making the visitation determinations. For example, although neither B.S.'s nor Mother's therapist had recommended resumption of visitation, on November 25, 2024, the court ordered that Mother could have a monitored one-hour visit and gave the Agency—not the therapist—

12

discretion to determine if follow-up monitored visitation would be appropriate. Then, in January, the court allowed monthly in-person visits and weekly video calls and in February, the court directed the Agency to evaluate further liberalizing in-person visits. Unfortunately, only a few weeks later, Mother became upset with B.S. at a scheduled visit and missed the next scheduled video call.

Substantial evidence supports the juvenile court's finding that Mother was offered reasonable reunification services.

## DISPOSITION

The petition for extraordinary writ is denied.


GOODING, J.

WE CONCUR:


MOORE, ACTING P. J.


SANCHEZ, J.